THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JUSTO GALINDO, Defendant-Appellant.

First District (4th Division)    No. 79-1705

Opinion filed April 30, 1981.

Ralph Ruebner and Rafael Schwimmer, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Deborah M. Dooling, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Justo Galindo, was found guilty of the murder of Pablo Lopez (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and of armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2). Defendant was sentenced to a prison term of 28 years for the crime of murder.

On appeal, defendant contends reversible error occurred when: (1) the trial court erroneously permitted a State's witness to testify in violation of the discovery rules (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)); (2) the trial court erroneously refused to admit impeachment evidence, and (3)

the trial court erroneously allowed the prosecutor to make improper and prejudicial remarks during closing argument.

We affirm.

### The State's Evidence

Santos Lopez, the brother of the victim, testified that on the evening of July 8, 1978, the night of the shooting incident, he and his two brothers, Manuel and Pablo, visited a tavern where they remained for about six hours. They each had four beers and four drinks. After they left the tavern they walked to a nearby restaurant and purchased some tacos. They then went back to their parked van and ate the tacos. Pablo and Manuel later left the van to purchase more tacos. They had nothing in their hands.

Sometime shortly thereafter, Santos heard shots. He went back to the restaurant, opened the door, and saw his brother Pablo doubled over and profusely bleeding. His other brother, Manuel, also was bleeding from a wound. Pablo died shortly after his arrival at a hospital.

On cross-examination, Santos asserted that he and his brothers did not speak to anyone in the tavern because they did not know anyone there. He also stated that when he heard a gun being fired, he had a premonition that his brothers were involved. He also stated that he found Pablo inside the restaurant and then he found Manuel after someone told him that Manuel was outside the restaurant.

Manuel Lopez also testified to the events surrounding the shooting incident. He asserted that when he and Pablo returned to the taco restaurant a second time, they were not carrying any weapons. Upon entering the restaurant, Manuel saw five men sitting at a table. He said to them "[w]hat's happening?" Their response was hostile. Pablo told them to calm down, but they wanted to fight. They told him to go outside. When Pablo reached the door and began to open it, Manuel heard two or three shots and fell to the floor. On cross-examination, Manuel asserted that he had opened the door and taken a step outside when he heard the shots. Manuel regained consciousness in the hospital. Manuel had been shot once in the face, twice in the back, and once in the arm.

Dr. Yuksel Konakci testified that he examined Pablo's body and observed a bullet wound on the left side of the back, one bullet wound on the right side of the chest, and two bullet wounds on the right arm. In his opinion, Pablo's death was caused by the bullet which entered the back and lacerated both lungs and the aorta, a major artery.

Miguel Claudio testified that on July 9, around 2 a.m., he was in a tavern on Chicago Avenue. At that time he heard two gun shots. He ran to the tavern door and opened it. As he looked across the street, he saw a man standing in front of the taco restaurant. The man was holding a gun and pointing it towards the restaurant. He then saw two men coming out

of the front door of the restaurant. They had nothing in their hands. The man holding the gun fired it and the first man coming out of the restaurant fell to the ground. The second man went back into the restaurant. Claudio asserted he did not see the man holding the gun shoot the second man. The gunman then ran in a westerly direction. Claudio was unable to identify the gunman because he did not see his face.

Claudio then ran across the street and saw that the man who had been shot was profusely bleeding. This man was outside of the restaurant. On cross-examination, Claudio asserted he did not know this man or his brothers prior to the shooting incident. Claudio also said again that he was unable to positively identify the gunman because he did not see his face.

Police Officer Pedro Garza testified that when he arrived at the restaurant, he observed a male, later identified as Pablo, lying on the floor just inside the restaurant doorway. He appeared to be dead. Officer Garza also observed another male Latin, later identified as Manuel, lying on the sidewalk, just east of the restaurant. He appeared to be alive. Officer Garza recovered five expended .38-caliber automatic cartridges near the bodies. On cross-examination, Garza asserted that he did not recover any weapons or baseball bats from the scene of the shooting.

The stipulated testimony of Donald Smith, a firearms expert, was read to the jury. In his opinion, all five expended bullets came from the same .38-caliber super automatic gun.

Investigator John Dahlberg testified that, on July 29, 1978, he went to San Bernadino to arrest the defendant, and returned with the defendant to Chicago on July 30, 1978. At police headquarters, Dahlberg interviewed defendant who told Dahlberg that on the night of July 8, 1978, he, his brothers Enrique and Rafael Galindo, his nephew Alentar, and his friend Jimenez, went to a taco restaurant to get something to eat. While they were there, a Mexican man came into the restaurant. This man grabbed Enrique's shoulder and said he wanted to fight with him outside the restaurant. Defendant told the man that they didn't want "any difficulties." Defendant also asked him not to fight. The man left, saying he would return.

Shortly afterwards, the man returned with another Mexican male and three other males who had baseball bats. The two Mexican men pulled defendant and Enrique outside of the restaurant. One of these other men demanded money from Enrique and Enrique gave him $70. The man then struck Enrique over the head with the baseball bat. The second Mexican man then took the baseball bat and he too hit Enrique. The blow caused Enrique to fall to the ground.

Enrique's assaulter then turned to defendant and, holding the baseball bat upright, started toward him. Defendant told him he did not want any trouble, but nevertheless the man continued toward him. Defendant

then pulled a pistol from his trousers, pointed it at the man, and said he did not want any trouble. When the man continued toward him, defendant fired the pistol several times. Defendant then turned and ran. When he looked back, the group began beating his brother. Defendant ran home and threw away the .38-caliber gun. Defendant left Chicago that night and hitchhiked to San Bernadino.

## The Defense
Hugo Dacinsio testified that on July 9, 1978, in the early morning hours, he was walking near a taco restaurant and he heard people arguing. Dacinsio looked in the window of the restaurant. He saw two men arguing. One man pulled another by his shirt and pushed him outside the restaurant. Then the man who was pushing the other hit the other over the head with what looked like a baseball bat. The man who had been struck fell to the ground. He did not know the man. He walked away because he did not want to get involved. After walking a few steps he heard a gun fire about five or six times. He did not see who fired the gun.

The defendant testified that while he was in the taco restaurant, a man who appeared to be drunk approached his brother Enrique and began calling him names. Defendant asked the man to leave and he did. A short time later, this man returned with another man and told Enrique to go outside of the restaurant. The men pulled Enrique outside. There were two or three more men outside who were holding baseball bats. They beat his brother Enrique and took his money.

The group then began to move towards defendant. Defendant told them to get away from him. When they kept approaching, defendant fired his gun. Defendant left for California that night because he feared that his family would not be safe if he remained.

Enrique Galindo testified that an intoxicated man and another man approached him in the taco restaurant and cursed him. Enrique told them he did not want any trouble. The men pulled him outside, where they were joined by others. All of them attacked him and, using baseball bats, they hit him over his head. They also took $70 from him.

On cross-examination, Enrique denied that he had had any conversations with the police at the hospital or at any time. He also asserted he did not tell any police officer that his brother had shot two people with a .38-caliber gun because of an argument over his father's death. He also denied telling the police that his brother went to Mexico.

## The State's Rebuttal
Three police officers testified to the substance of their conversations with Enrique. The officers' testimony substantially contradicted the cross-examination testimony of Enrique.

The jury found defendant guilty of murder and armed violence. This appeal followed.

OPINION

I

Plaintiff first contends that the State's failure to give defense counsel notice of the identity of its rebuttal witness violated the discovery rules (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)) and the trial court's refusal to exclude the witness' testimony denied defendant a fair trial. The discovery rules provide that the State must give defendant the names and addresses of witnesses the State intends to call in rebuttal, together with the information to be disclosed, and a specific statement as to the substance of the testimony the witnesses will give at trial. Where rebuttal witnesses are concerned, the State need not inform the defendant of the foregoing until the intent to call the rebuttal witness is formed. (*People v. Hine* (1980), 89 Ill. App. 3d 266, 411 N.E.2d 930; *cf. People v. Stinson* (1976), 37 Ill. App. 3d 229, 345 N.E.2d 751; *People v. Manley* (1974), 19 Ill. App. 3d 365, 311 N.E.2d 593.) The reason for this rule is that a prosecutor cannot know if a witness will be called in rebuttal until the defense testimony is heard. *People v. Hine.*

The goal of discovery is to eliminate surprises and unfairness and afford an opportunity to investigate. Sanctions in aid of that purpose are to compel compliance with discovery orders. (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 415 N.E.2d 688.) Exclusion of evidence is a last resort and the imposition of this sanction is within the trial court's discretion. *People v. Brown* (1980), 89 Ill. App. 3d 852, 412 N.E.2d 580.

In this instance, on November 14, Officer Jessie Camarena was called to testify as a rebuttal witness to impeach the testimony of Enrique Galindo. Camarena was questioned and testified to the substance of a conversation he had had with Enrique Galindo. The day before this witness was called, Enrique had denied ever having had a conversation with Officer Camarena.

Defendant claims that he was substantially prejudiced since he was not given information about the rebuttal witness in advance. However, during cross-examination of Enrique, the prosecutor informed counsel and the court that he was laying a foundation for impeachment. It is apparent that defense counsel must have known from the State's laying a foundation for impeachment that only the officer with whom Enrique had conversed, namely Camarena, could be presented to contradict Enrique's testimony.

■■ We agree that the proper procedure is to have the State inform defense counsel of witnesses who will be called to testify in rebuttal when the State forms that intention—here, after Enrique's cross-examination.

The trial court however is not *required* to exclude the rebuttal witness' testimony, even though there has not been strict compliance with the discovery rule. As noted previously, the exclusion of evidence in such circumstances is within the sound discretion of the trial court. (*People v. Brown* (1980), 89 Ill. App. 3d 852, 412 N.E.2d 580.) The exercise of this discretion will only be reviewed upon a showing of prejudice to defendant. *People v. Brown* (1980), 89 Ill. App. 3d 852, 412 N.E.2d 580; *People v. Brown* (1976), 41 Ill. App. 3d 641, 354 N.E.2d 602.

■■ Here, defendant has failed to show prejudice or surprise resulting from the alleged untimely absence of rebuttal witness information. During the side-bar the following colloquy occurred:

> "The Court: Your witness [Enrique] was asked numerous questions—in fact, I think there were 17 separate things which the State asked him regarding whether he had stated this to a certain officer * * * namely this officer. So I don't know how you can possibly claim surprise.
>
> [Defense counsel]: *I understand that* but * * * the fact [is they] did not disclose the name of this particular officer [and this] is an attempt to—some subterfuge on their part, to prevent the defense from properly preparing * * * by affording an opportunity to interview this particular witness." (Emphasis added.)

Defense counsel, however, did not request a continuance to interview the officer. In a situation such as here, the failure to request a continuance generally waives a claim of error based on surprise. (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 415 N.E.2d 688.) The record also discloses a very able and in depth cross-examination of the witness. We are unable to ascertain any prejudice to defendant as a result of the trial court's ruling. We necessarily conclude that under these circumstances the trial court's ruling was not a manifest abuse of discretion and no prejudice to defendant's right to a fair trial has been shown.

## II

Defendant next contends that prejudicial error occurred when the trial court restricted defendant's attempts to examine a defense witness to elicit evidence which would impeach a prosecution witness. The State argues that defendant did not lay a proper foundation for impeachment of the prosecution witness and, consequently, the trial court correctly restricted defendant's attempts to elicit impeachment evidence.

Defendant attempted to impeach Miguel Claudio's testimony about the shooting by asking Officer Garza whether or not Claudio reported to Garza, after the shooting incident, that he, Claudio, had observed a man shoot another person who was coming out of the taco restaurant. On direct-examination, Claudio asserted that he had witnessed this event. On

cross-examination, defense counsel asked whether Claudio had given a statement "[a]s to what he observed" to the "Chicago Police Department." Claudio responded that he had told the investigating officer "[e]xactly what I told you."

■■ If in a witness' trial testimony there has been a material omission of matters contained in the witness' prior statement, evidence of the omission should be admissible to discredit the witness' testimony. (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876.) Before a witness may be impeached by a prior inconsistent statement, however, a proper foundation must be established by directing the attention of the witness to the time, place, and circumstances of the statement, as well as to the substance of the statement. (*People v. Henry.*) The purpose of a proper foundation is to avoid unfair surprise and to give the witness an opportunity to explain. *People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289; *People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865.

■■ As in *People v. Smith*, the defendant here argues that the formal foundation requirements may be relaxed where the purposes of the foundation have been satisfied. To support this argument, defendant relies upon *People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876, wherein the formal foundation requirement was not invoked. *People v. Henry* is distinguishable, however, from the instant case because there, the foundation requirements were substantially satisfied. The witness in *Henry* was asked whether she had had a prior conversation with the impeacher regarding the statement she had given to the police during their investigation. The witness was alerted to the substance of the remark and to the identity of the person to whom it was allegedly made. Thus, the element of unfair surprise was eliminated. Here, however, as in *People v. Smith*, defense counsel only asked Claudio generally if, at any time, he had given a statement to the Chicago police as to what he had observed. Thus, Claudio was not apprised of the substance of the alleged omission.[1] We agree with the State that the foundation here was too general and inadequate to qualify under the *Henry* substantial satisfaction exception to the foundation requirement for impeachment evidence. (*People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289.) Accordingly, we conclude that the trial court's ruling, which restricted Officer Garza from allegedly testifying to the omission, was not erroneous.

[1] On appeal, defendant's brief refers to the omission as "allegedly" impeaching. Since defense counsel at trial stated only that "apparently" Claudio did not relate the same version of the shooting incident to the police officer at the scene, we are unable to determine the substance of the omission or the inconsistent statement or even if there was in fact an omission or an inconsistent statement. If there is nothing inconsistent between the trial testimony and the prior statement, the court may properly prohibit the introduction of the prior statement. *People v. Lindsey* (1979), 69 Ill. App. 3d 493, 387 N.E.2d 828.

## III

Defendant next contends that he was denied a fair trial by the prosecutor's closing rebuttal argument.

■■ Defendant refers to comments by the prosecutor which characterized the defense as a fraud and a sham. The prosecutor also asserted that defendant and his witnesses lied and that one defense witness was a "bum." Defendant, however, failed to object to these comments when they were made. Failure to object at trial to allegedly improper closing arguments waives those issues for appeal. (*People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.) In the waiver situation, the plain error rule provides the only basis for appellate review; this, however, is a limited exception and will be invoked only to correct grave errors or where the case is close factually and fundamental fairness requires review of the issue. (*People v. Thompson* (1981), 93 Ill. App. 3d 117, 416 N.E.2d 1222.) Neither of these situations is present here.

Although we do not approve of the comments here, we do not believe they were seriously prejudicial and a material contributing factor to defendant's conviction. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) In marked contrast to the case here, the prosecutor in *Weathers*, a case cited by defendant, accused defendant and his attorneys of telling lies and declared that the court knew that the defendant had committed the crime.

■■ We believe the comments here are not so prejudicial in nature or substance as to require review under the plain error rule or reversal. The version of the incident given by defendant and his witnesses was inconsistent. In addition, much of the defense trial testimony was contradicted by prior inconsistent statements.

Defendant also urges as reversible error two prosecutorial comments to which he did object. The prosecutor argued that the defense was a fraud because at the start of trial, the defense led the jury to believe that defendant was attacked by persons carrying baseball bats or "kickers," which are carpet stretching tools. Then, the prosecution asserted:

> "Now the defense changed. The reason on Friday he didn't know whether it was a baseball bat or something else, because back on Friday they decided the weapons were going to be kickers.
> * * *
> I would suggest that over the weekend they saw an actual kicker and realized it looks nothing like a baseball bat.
> [Defense counsel]: Objection.
> The Court: Overruled. The jury heard the evidence."

Later, the prosecutor commented upon Enrique's testimony that he had

been hit with a baseball bat. First, he referred to Dr. Aleeni's testimony that the head injury was minor. Then the prosecutor said:

"A minor injury to the head, an injury, sure, but * * * not something that would seem to be from anyone standing over you beating your head in with a baseball bat * * *. You're going to have some serious injuries.

I have seen a lot of people go away for murder that I have tried for beating other people to death with baseball bats. It doesn't take a lot.

[Defense counsel]: Objection.

The Court: The jury heard the evidence."

The State argues that the comment was a legitimate inference to be drawn from the testimony of Enrique. He testified his head had been hit with a baseball bat three separate times and that the last blow was so staggering that he was knocked to the ground.

Considering the record as a whole and the arguments in their entirety, as we must to determine whether these remarks are so prejudicial that reversal is required (*People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800), we are unable to conclude that the remarks resulted in any substantial prejudice to defendant. While we do not condone the prosecutor's reference to other trial experience with baseball bats, we cannot say the comment was a material factor in defendant's conviction or that the judgment may have been different had the prosecutor refrained from making this comment. See *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771; *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.

Accordingly, for the reasons given, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI, P. J., and JIGANTI, J., concur.